COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Ortiz, Friedman and White
Argued at Christiansburg, Virginia


DOMINIC THOMAS NOVIA
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1449-23-3            JUDGE KIMBERLEY SLAYTON WHITE
                                                         JUNE 18, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
Timothy W. Allen, Judge

Aaron B. Houchens (Aaron B. Houchens, P.C., on brief), for
appellant.

Aaron J. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Dominic Thomas Novia for second-degree

murder, using a firearm in the commission of a felony, and two counts of malicious shooting in an

occupied building.  The trial court sentenced Novia to 53 years' imprisonment with 30 years

suspended.  On appeal, Novia argues that the evidence was insufficient to support his convictions,

arguing that there was scant physical evidence, there was no motive, and the true culprit confessed.

We disagree and affirm the trial court's judgment.

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.

Hudson*, 265 Va. 505, 514 (2003)).  That principle requires us to "discard the evidence of the

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

In December 2021, Novia lived with his grandparents, Albert ("Albert") Cook, Sr. and Mary Ann ("Mary Ann") Cook, at their Franklin County home. Novia had moved back to live with his grandparents after living with Brittany Poindexter, the mother of his child. Mary Ann cared for the child Novia shared with Poindexter during the day while Poindexter worked. Novia and Mary Ann sometimes argued about the babysitting arrangement.

Mary Ann drove Novia to work in Salem on December 22, 2021. After running some errands in Roanoke and receiving a call that Novia had finished work, Mary Ann and Albert took the keys to her truck to Novia so he could drive home later.

At roughly 8:00 p.m. that evening, Novia returned with the truck to find Mary Ann and Albert waiting at home on the living room sofa. After he arrived and entered the house, Novia pulled off his shirt, and then lowered his shorts to expose his genitals. Novia stated, "[T]his is what a man look [sic] like." He pulled up his pants and went outside. Novia had a shotgun when he returned inside. Mary Ann told Novia to take the gun out of the house before he or someone else got hurt. Novia turned to leave, fired the shotgun into the kitchen wall, went outside, and fired the gun three or four more times.

Albert called Poindexter and reported that Novia was "outside shooting and going crazy." Poindexter called 911 and requested that the police respond to the situation.

A few minutes after firing the gun outside, Novia came inside again and stood in the doorway of the living room without saying a word. Albert looked at Mary Ann, who was seated on the couch beside him, and saw "a little red dot right between her eyes." Albert testified that he did

not see a gun but heard a "pop." Mary Ann immediately fell onto Albert, and there was blood coming from her forehead.

Albert was crying when he called Poindexter a second time and reported that Novia had killed Mary Ann. Poindexter called 911 again and relayed what Albert had said.

After receiving initial information that Novia was drunk, disorderly, and shooting a gun, Deputy Travis Dillon of the Franklin County Sheriff's Office went to the Cooks' address and waited at the bottom of the driveway for backup assistance. While retrieving his rifle from the trunk of his car, Deputy Dillon heard a "faint pop" from the direction of the house. Deputy Dillon headed up the driveway on foot and heard "something running" away from the house into the woods and toward Bethlehem Road. When he reached the top of the driveway, Deputy Dillon saw a vehicle riddled with bullet holes. These events—the hearing of a pop, something running through the woods, and the condition of the vehicle—made Deputy Dillon decide to wait outside the home for backup to arrive.

When backup assistance arrived, Deputy Dillon and other officers entered the home. Albert was crying and visibly upset. He said that his grandson had just killed Mary Ann. Mary Ann was on the living room couch; she had suffered a fatal gunshot wound to the head. A cartridge casing, of a type fired from a handgun, was between the couch and the end table. The police located an apparent shotgun hole in the kitchen wall above the stove. A subsequent search of the crime scene located two shotguns. The murder weapon (a handgun/pistol), however, was never located.

The police found firearms in the yard outside the house and in the bed of a red pickup truck. They also found three shotgun shells in the yard. Keys were in the ignition of a white Nissan pickup truck that had been backed into a tree. The truck was making a "dinging" sound as though the ignition switch was engaged.

That night, while Kenny Radcliffe was stopped at a Shell station on Bethlehem Road, Novia entered Radcliffe's vehicle and asked for a ride to Rocky Mount. Radcliffe refused and ordered Novia out of the car. Despite the cold temperature, Novia was wearing white shorts and no shirt. Novia beat on the windows of a building, then hid under a minivan before eventually disappearing into a dumpster area. Radcliffe called 911. After searching the vicinity of the gas station and a nearby church on foot and with the assistance of a police drone, the police located Novia on a creekbank and arrested him. As Novia was being transported to jail, he inquired as to why he was being arrested and claimed to not understand why he was in custody.

Novia's defense at trial was that Albert committed the murder. In support of that defense, Albert's son – Albert Jr. – testified that Albert admitted that he had killed Mary Ann.[1] According to Albert Jr., when Albert made the statement, his niece, Vivian Holland, said for Albert to "shut his damn mouth."[2] Michelle Sheppard, Albert Jr.'s girlfriend, testified that she heard Albert's admission about killing Mary Ann and that Albert and Albert Jr. got into an argument.[3] Neither Albert Jr. nor Sheppard told the police about the alleged confession of Albert. At trial, however, Albert denied saying, during a conversation with his son, that he had killed Mary Ann.[4]

---

[1] Albert Jr. admitted having 16 prior felony convictions.

[2] Holland denies having ever made this statement and denies that Albert confessed with her present.

[3] Sheppard admitted that she had a prior conviction for larceny.

[4] On cross-examination, Albert denied saying that he killed Mary Ann. The following exchange then occurred on re-direct examination by the prosecutor.

> Q Mr. Cook, did you kill your wife?
> A Yes, ma'am, I love her. I loved that woman for fifty-five years.
> Q Oh. What did you think I asked you?
> A He asked me if I told my son I killed my wife.
> Q That's what he asked you?
> A Yes, ma'am.
> Q My question to you is did you kill your wife?

Albert went to live with Holland after the shooting. Holland was present whenever Albert Jr. and Sheppard came to Holland's house to talk to Albert. Holland denied that Albert ever said he had killed Mary Ann; Holland asserted that she would have immediately reported any such statement to the police.

Testifying on his own behalf, Novia said that he accidentally fired a shotgun into the kitchen wall on the night Mary Ann was killed. Then, he claimed, he went outside and fired shotguns to reduce his stress. Novia denied reentering the house with a gun and shooting Mary Ann. He testified that when he left the residence, his grandmother was still alive, and Albert was the only other person in the residence with her. Novia said he fled from the police that night because he had fired the shotgun into the kitchen wall and did not want to go to jail.

Following the jury's verdict of guilty to all charges, the trial court sentenced Novia to an active period of incarceration in the Virginia Department of Corrections for 23 years[5] for

---

A  No, ma'am, I did not.
Q  Do you know who killed your wife?
A  Evidently, they — they trying to say I killed her but I know that he—my grandson was the one that had the red dot between her eyes and that's when she died.  That's all I can—
Q  Did you have a gun in your hand the night your wife died?
A  Huh?
Q  Did you ever have a gun in your hand the night your wife died?
A  No, ma'am, I did not.
Q  Was there anybody else in the house other than you, Dominic, and your wife?
A  No, ma'am, there was not.
Q  Do you have any confusion about what happened that night that caused your wife to die?
A  I'm getting confused because they going to come out and try to say I told my son I killed my wife.
Q  No.  Do you know for sure who killed your wife?
A  Dominic Novia.

[5] Novia was sentenced to 53 years total, with 30 years suspended.

second-degree murder, use of a firearm in commission of a felony, and maliciously firing a gun in an occupied dwelling. Novia filed a timely appeal for all convictions.

ANALYSIS

Novia challenges the sufficiency of the evidence to sustain his convictions. He argues that there were no eyewitnesses that saw him fire the fatal shot, there is no forensic evidence to support his conviction, and no murder weapon was recovered. Finally, Novia asserts that Albert confessed to the shooting, therefore the case does not present an issue of mere witness credibility.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). Additionally, when the sufficiency of the evidence is challenged on appeal, an appellate court "review[s] the evidence in the 'light most favorable' to the Commonwealth, the party prevailing in the trial court." *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Hudson*, 265 Va. at 514).

Contrary to Novia's assertion otherwise, it was within the jury's purview to assess the credibility of the testimony and other evidence presented at trial. "[T]he credibility of a witness, the

weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination." *Fletcher v. Commonwealth*, 72 Va. App. 493, 502 (2020) (quoting *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999)). This Court must "accept the trial court's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (quoting *Walker v. Commonwealth*, 258 Va. 54, 70-71 (1999)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). And "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).

Additionally, a jury verdict will not be set aside on appeal unless "plainly wrong or without evidence to support it." *Bitar v. Rahman*, 272 Va. 130, 137 (2006). A trial court "must accord the jury verdict the utmost deference." *21st Century Sys., Inc. v. Perot Sys. Gov't Servs., Inc.*, 284 Va. 32, 41 (2012) (quoting *Bussey v. E.S.C. Rests., Inc.*, 270 Va. 531, 534 (2005)). It "may not substitute its conclusion for that of the jury merely because [it] disagrees with the result." *Id.* at 42.

Novia states that in this case, the testimony of Albert was incredible and served as the only meaningful evidence upon which a conviction could rest. He claims the Court should reject his grandfather's testimony and reverse the jury's verdict. In response to Novia's claim of insufficient evidence, the Commonwealth relies on the fact that in proving the identity of a criminal actor, the Commonwealth may rely on circumstantial evidence. *See Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999); *Stamper v. Commonwealth*, 220 Va. 260, 272 (1979) ("Indeed, in some cases

circumstantial evidence may be the only type of evidence which can possibly be produced."). "It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). But as with any element of an offense, identity may be proved by direct or circumstantial evidence. *Crawley*, 29 Va. App. at 375.

The evidence, circumstantial and direct, overwhelmingly supports the jury's factual finding that Novia shot and killed his grandmother. With the burden on the Commonwealth to prove Novia's guilt beyond a reasonable doubt, they put forth a plethora of evidence. First, the evidence proved that Novia appeared at his grandparents' home, exhibiting strange behavior by pulling down his pants, exposing himself to them. He then fired a shot into a wall of the residence. After firing guns outside, Novia returned to the home. Albert and Mary Ann were together on the living room couch. Albert saw a "red dot" on Mary Ann's forehead. A "pop" sound immediately followed, and Mary Ann fell over. She had suffered a fatal gunshot wound to the head. Afterward, Novia fled the scene, taking great lengths to escape the police, including apparently backing a truck into a tree and trying to get a ride at a nearby gas station. Considering the evidence as a whole, a reasonable trier of fact could conclude beyond a reasonable doubt that Novia was the person who fired a gun inside the house and killed Mary Ann and that he was guilty of the charged offenses.

Novia asserts that Albert "confessed" to killing Mary Ann. But Albert expressly denied making any such admission to Albert Jr. or Sheppard, and Albert's testimony was supported by Holland. The jury was entitled to consider Albert Jr.'s and Sheppard's prior convictions in

assessing their credibility on this issue. *See* Code § 19.2-269; Va. R. Evid 2:609(b). Novia also maintains that Albert confessed to the killing during his own testimony. When read in context, however, a jury could conclude that, although at first confused by the questioning, Albert confirmed that only he, Mary Ann, and Novia were present when the shooting occurred and that Novia was the person who killed Mary Ann.

The jury found that the Commonwealth's witnesses were credible and rejected Novia's stance that Albert committed the murder. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Sandoval v. Commonwealth*, 20 Va. App. 133, 138 (1995). The jury found the testimony of the Commonwealth's witnesses to not be inherently incredible as a matter of law. Therefore, the finding of the jury that Novia was guilty was backed by sufficient evidence and was an issue purely for the fact finder to decide.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*